Thomas V. Van Flein, Esq.
CLAPP, PETERSON, VAN FLEIN
TIEMESSEN & THORSNESS, LLC
711 H Street, Suite 620
Anchorage, Alaska 99501-3454
Tel:  (907)  272-9272
Fax:  (907)  272-9586
(907) 272-9272
usdc-anch-ntc@cplawak.com
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

THE ALASKA DENTAL SOCIETY, THE        )
AMERICAN DENTAL ASSOCIATION,          )
DR. T. HOWARD JONES, DR.              )
MICHALE BOOTHE, DR. PETE HIGGINS      )
AND DR. GEORGE SHAFFER,               )
                                      )
              Plaintiffs,             )
                                      )
vs.                                   )
                                      )
THE ALASKA NATIVE TRIBAL HEALTH       )
CONSORTIUM and DOES 1 through 8,      )
                                      )
              Defendants.             ) **CASE NO:3:06-CV-00039-TMB**
_____) Filed Electronically

## OPPOSITION TO MOTION TO DISMISS

Plaintiffs, The Alaska Dental Society, Dr. Boothe, Dr.

Higgins and Dr. Shaffer (collectively Plaintiffs), through

Counsel, hereby submit their Opposition to the Defendant's

Motion to Dismiss (Standing) (hereafter "Motion").    As

explained below, Plaintiffs have individual, third-party, and

associational standing to bring this suit.  In addition, they

OPPOSITION TO MOTION TO DISMISS (STANDING)
*The Alaska Dental Society et al v. The Alaska Native Tribal Health
Consortium, et al.*, Case No. 3:06-cv-00039-TMB
Page 1 of 36

have express statutory standing, or at a minimum, implicit statutory standing.

## I. FACTUAL BACKGROUND

### A.    Events Leading Up to the Suit

The operative facts in this case are straight forward. The state, pursuant to its traditional police powers to regulate and control business and professions, enacted what is referred to as the Dental Practice Act. *See* AS 08.36, *et seq*. Alaska law, AS 08.36.100, provides that "a person may not practice, or attempt to practice, dentistry without a license and a current certificate of registration." The practice of dentistry includes extraction of teeth, pulpotomies, restorations, and therapeutic treatments. Specifically, AS 08.36.360(a) (b), (c) & (f) prohibit extraction of teeth and other procedures without a license. The issue now before the Court is the Defendant's use of, supervision of, and support of Dental Health Aid Therapists ("DHATs"). These DHATs claim the right to practice dentistry without a license.

According to the Defendant, as of March 2005, it hired or facilitated the supervision and hiring of four DHATs who practice in Bethel and Kotzebue. These DHATs treat caries, perform pulpotomies on deciduous teeth, perform extractions of primary and permanent teeth, respond to dental emergencies to

alleviate pain and infection, and administer local anesthetic. The Defendant admits that the Bethel DHATs under its control practiced dentistry by performing hundreds of restorations, several pulpotomies, seating stainless steel crowns and extracting hundreds of teeth. By supervising these activities, the ANTHC is violating the state Dental Practice Act by "exercise[ing] control over professional dental matters or the operation of dental equipment in a facility where the acts and things described in [the Dental Practice Act] are performed or done."

The State of Alaska has demonstrated the importance of protecting the public from the unlicensed practice of dentistry by criminalizing this misconduct. *See* AS 08.36.340 ("A person who violates any provision of this chapter or regulations adopted under this chapter for which no specific penalty is provided is guilty of a class B misdemeanor"). Notwithstanding state law, the Defendant flouts the State's criminal laws and promotes the unlicensed practice of dentistry. In February 2005, the Alaska State Dental Board determined that DHATs and the services they intended to provide constituted the unlawful practice of dentistry, but the Defendant continued—and continues—unabated. (Exhibit 4)

The scope of the problem is immense. According to the Defendant's parent organization, the Alaska Tribal Health

System ("ATHS") the ATHS meted out health care to 119,241

Alaska Natives in 2000:

> The rural Native health organizations not only serve a Native population in most areas they are the only healthcare providers available, and therefore serve everyone in the area regardless of race. In 2000, the ATHS *served 119,241 Alaska Natives, 19 percent of the state's population*. At that time, 178 village clinics employed 468 community health aide/practitioners, although there were 32 practitioner vacancies. Alaska is the only state in which over 99 percent of health programs are managed by tribes and Native organizations.[1]

Thus, the current plan to provide unlicensed and illegal

dental services to Alaska Natives (and others) could

implicate 19 percent of Alaskans.

The alleged justification for violating state criminal

laws is a form of preemption grounded in a miasma of

"sovereignty" and "self-determination." While it may be true

for real Indian tribes to claim a limited form of sovereignty

in "Indian Country" and therefore immunity from state laws,

(*see Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978)),

with one exception not applicable here, there is no "Indian

Country" in Alaska, and therefore no such sovereign immunity

---

[1] http://www.anhb.org/index.cfm?section=Advocacy&page=Priorities&viewpost=2&ContentId=12 (last accessed April 28, 2006).

OPPOSITION TO MOTION TO DISMISS (STANDING)
*The Alaska Dental Society et al v. The Alaska Native Tribal Health Consortium, et al.*, Case No. 3:06-cv-00039-TMB
Page 4 of 36

from the state laws.   The situation of the Alaska Natives warrants a brief digression. In 1971, Congress settled Alaska tribal claims by passing the Alaska Native Claims Settlement Act ("ANCSA"). In exchange for relinquishing their claims to 365 million acres, Alaska Natives received land selection rights to 44 million acres plus cash payments equaling $962.5 million. Title to these lands was vested in tribal village corporations (not governments), chartered under state law, and individual Alaska Natives became corporate shareholders. According to the Supreme Court, when ANCSA became law, most Alaska Native land ceased to be "Indian Country." *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520 (1998). The death knell for "sovereignty" in Alaska beat its last drum at that time.[2]

---

[2] Although the Defendant, on behalf of itself and its constituent members, claims sovereignty and independence from State regulatory control, in fact the very Congressional legislation that allows the creation of the ANTHC and its members, 43 O.K. § 1601 (b), sets forth Congressional policy, which provided that the resolution of the Native land claims was to be "without establishing any permanent racially defined institutions, rights, privileges, or obligations, without creating a reservation system or lengthy warship or trusteeship, and without adding to the categories of property and institutions enjoying special tax privileges or to the legislation establishing special relationships between the United States Government and the State of Alaska. . . ."   In direct contravention to Congressional intent, and in direct

The policy of the state of Alaska has been to reject claims of sovereignty in all areas, concluding that "Alaska is one country, one people." Admin. Order No. 125 (Gov. Hickel) (Aug. 16, 1991), *available at* http://www.gov.state.ak.us/admin-orders/125.html (last visited April 25, 2006). The Alaska Supreme Court resolved this issue years ago in *Native Village of Stevens v. Alaska Management and Planning* 757 P.2d 32 (Alaska 1988): "There are not now and never have been tribes of Indians in Alaska as that term is used in federal Indian law."

This discussion of "sovereignty" applies to the case here in that case law has already determined that the state has the power to regulate Alaska Natives and its Native Corporations. The Defendant's claim to the contrary should be unavailing.[3]

---

contravention to state law, the Defendant claims a special "category" of exemption based on "racially defined institutions."

[3]    For example the United States Supreme Court held fishing laws inapplicable within the Annette Island Reserve but applicable to Natives in a village not located on a federal reservation. *Compare Metlakatla Indian Cmty. v. Egan*, 369 U.S. 45 (1962) *with Organized Vill. of Kake v. Egan*, 369 U.S. 60 (1962). The Court reasoned that the Alaska Natives in both situations had aboriginal rights to fish, but that the state could regulate those rights. Since the Natives in *Kake*

The Defendant claims that neither it, nor any of its employees (or pass through members) has to comply with state law. Notwithstanding the fact that the Alaska Supreme Court has conclusively established that there is no "Indian Country" in Alaska, the ANTHC purports to justify its violation of state law based on "self determination" and "sovereignty" and other attributes of "Indian Country."[4]

## B.    Injury and Harm

This case involves a variety of injuries, including: (1) harm to the general public through second class and substandard dental care; (2) violation of the collective

---

fell under state jurisdiction, they had to abide by the fish-trap laws. This suit seeks the similar enforcement of state laws.

[4] According to the ANTHC, "The Community Health Aide Program, and its dental component, do not fall within the parameters of the Alaska State Medical or Dental Practice Acts" and therefore these entities refuse to comply with state law or recognize the true sovereignty of the State of Alaska, and the ANTHC explains its defiance in part on the "Indian Self-Determination and Education Assistance Act of 1975" which it claims governs the DHAT program here and "recognized the primacy of the government-to-government relationship between the United States and sovereign tribal nations"  to the exclusion of the State of Alaska. See ANTHC Program Brief, available at http://www.phs-dental.org  This argument presumes there are "sovereign tribal nations" in Alaska.

rights of licensed dentists to uphold the standard of health care in their communities; and (3) the collective right to prevent the unauthorized practice of dentistry and any resultant economic harm such practice could inflict against those that comply with the rules. As noted by Dr. Boothe, licensed dentists are saddled with large student loans incurred at ADA accredited institutions, and must pay for operative practices that have modern equipment, staff and procedures, all of which requires a financial investment. The unlicensed practice of dentistry affects these interests. (Boothe Affidavit).

## II. ARGUMENT

### A.  Plaintiffs Have Standing.

#### 1.  Individual Standing

The Defendant generally alleges that the Plaintiffs lack standing. The Supreme Court has noted that "[g]eneralizations about standing to sue are largely worthless as such." *Association of Data Processing Service Organization Inc. v. Camp*, 397 U.S. 150, 151 (1970).

Standing can be obtained through a variety of methods. One recognized basis for standing is statutory standing, that is, standing either expressly or implicitly conferred by

statute.  Here, the Plaintiffs have statutory standing under
Alaska law.   Drs. Boothe, Higgins and Schaffer are required
under state law to abide by the ADA Principles of Ethics.  *See*
12  AAC  28.905  (b)  ("The  American  Dental  Association's
Principles  of  Ethics  and  Code  of  Professional  Conduct,  with
official  advisory  opinions  revised  to  April  2002,  is  adopted
by  reference  as  the  ethical  standards  for  dentists  and  applies
to all dentists in the state").  (Exhibit 5)  Thus, these ADA
standards  have  the  force  of  law  in  Alaska  and  frequently  form
the  basis  for  legal  action  against  licensed  dentists  by  the
State Dental Board.

Section 3 of the ADA Principles of Ethics, mandates that
"the  dentist  has  a  duty  to  promote  the  patient's  welfare."
The advisory explanation states:

> This  principle  expresses  the  concept  that
> professionals  have  a  duty  to  act  for  the
> benefit  of  others.    Under  this  principle,
> the  dentist's  primary  obligation  is  service
> to the patient *and the public-at-large*.   The
> most  important  aspect  of  this  obligation  is
> the  competent  and  timely  delivery  of  dental
> care  within  the  bounds  of  clinical
> circumstances presented by the patient . . .

Section 3 of the ADA Principles of Ethics (emphasis added).
(Exhibit 5)  Thus, this section imposes a legal duty to act on
behalf  of  the  patients  "and  the  public  at  large."    This
language  confers  standing  on  the  individual  dentists,  as  well

OPPOSITION TO MOTION TO DISMISS (STANDING)
*The Alaska Dental Society et al v. The Alaska Native Tribal Health
Consortium, et al.,* Case No. 3:06-cv-00039-TMB
Page 9 of 36

1  as the associations which are comprised of individual dentists

2  to protect patient interests and public health.

3      In addition, Section 3.A provides that dentists "have an

4  obligation to use their skills . . . for the improvement of

5  the dental health of the public . . . ." Finally, Section 4

6  mandates that dentists have a duty "to treat people fairly."

7  Part of this duty, it is explained, is to deal with people

8  justly and to deliver "dental care without prejudice."

9  Further, dentists are obligated, under Section 4.A, to provide

10 dental services irrespective "of the patient's race, creed,

11 color, sex or national origin." The second-class services

12 foisted upon Alaska Natives by the Defendant are contrary to

13 the requirements of providing professional services

14 irrespective of race.

15     These provisions, enacted as law under Alaska

16 regulations, create both express duties upon licensed dentists

17 to protect the public relative to dentistry, and at a minimum,

18 create an implied right of action. The state legislature,

19 just like Congress, can create private rights of action to

20 enforce laws. See *Alexander v. Sandoval*, 531 U.S. 1049, 121

21 S.Ct. 1511, 1519, 149 L.Ed.2d 517 (2001) (federal private

22 right of action). The legislative body creating the law

23 establishes the intent, either expressly or impliedly,

24

25

OPPOSITION TO MOTION TO DISMISS (STANDING)
*The Alaska Dental Society et al v. The Alaska Native Tribal Health
Consortium, et al.,* Case No. 3:06-cv-00039-TMB
Page 10 of 36

26

although neither the statute nor the legislative history needs to expressly declare the existence of such a right for a court to determine that the legislature or Congress has in fact created one. *Id.; Thompson v. Thompson,* 484 U.S. 174, 179, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988) ("The implied cause of action doctrine would be a virtual dead letter were it limited to correcting drafting errors when Congress simply forgot to codify its evident intention to provide a cause of action.").

The Plaintiffs have raised several additional concerns, all of which confer standing. In order to qualify for a state dental license, an applicant must have graduated from a dental school accredited by the Commission on Dental Accreditation ("CODA"). Whereas the prerequisites simply to get into dental school are rigorous, the only known prerequisite to be a DHAT is that the candidate possesses "no less than sixth grade math and reading skills." Community Health Aide Program Certification Board Standards and Procedures, sec.5.10.040. As a result of the extreme lack of training, the unlicensed and unregulated practice of illegal dentistry represents a clear and present threat to the public health and safety. The State Dental Board concluded as such. (Exhibit 4)

It is notable that standing in the state courts is liberal and relatively easy to achieve—and state court is where this suit was filed and where it belongs. Only the Defendant has sought federal court interference with a state law matter, and by its choice, now seeks to thrust the more stringent federal standing requirements upon the Plaintiffs. But under either standard, standing exists.

The "case or controversy" clause of Article III of the Constitution[5] imposes a minimal constitutional standing requirement on all litigants attempting to bring suit in federal court. Of course, the Plaintiffs did not seek to bring suit in federal court. But assuming they did for the

---

[5] Article III, Section 2, provides:

> The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;--to all Cases affecting Ambassadors, other public Ministers and Consuls;--to all Cases of admiralty and maritime Jurisdiction;--to Controversies to which the United States shall be a Party;--to Controversies between two or more States;-- between a State and Citizens of another State;--between Citizens of different States;--between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

moment, in order to invoke the court's jurisdiction, the plaintiff must demonstrate, at an "irreducible minimum," that: (1) he/she has suffered a distinct and palpable injury as a result of the putatively illegal conduct of the defendant; (2) the injury is fairly traceable to the challenged conduct; and (3) it is likely to be redressed if the requested relief is granted. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982). Here, the Plaintiffs more than satisfy these standards.

It is established that economic interests are legally protected interests. Accordingly, the Supreme Court has had no difficulty finding standing where the plaintiff's economic interests are, or could be, adversely impacted. *Clinton v. New York*, 524 U.S. 417, 432 (1998). The Supreme Court has been broad in its approval of standing in this regard. Thus, economic injury need not have occurred in order to gain standing; rather, standing will result from policies, laws or conduct that are likely to deprive the plaintiff of a competitive advantage or a bargaining chip. *Clinton v. New York*, 524 U.S. at 432-34 (the Court found that a cooperative had standing to challenge the veto of a tax benefit enacted to

enhance their ability to purchase processing plants); *Association of Data Processing Service Organization v. Camp*, 397 U.S. 150, 154-56 (1970) (the Court concluded that a data processing service provider association had standing to challenge a decision to permit banks to provide such services to other banks).

Indeed, the factual pattern in *Association of Data Processing* is analogous to the issues here relative to standing in that the unlicensed practice of dentistry has the potential to cause economic harm to the Plaintiffs. (See Boothe Affidavit, para. 9). ("A licensed dentist must invest in expensive equipment, staff and physical office space. The unlicensed DHATs do not have to incur these costs. The provision of dental services by unlicensed DHATs therefore poses an economic risk to the dental market by unfairly providing services without having to expend the time and resources required of licensed dentists").

In *Clinton v. New York*, for instance, the Court held that New York had standing to challenge the veto of legislation that permitted the state to keep disputed Medicare funds. *Clinton*, 524 U.S. at 432-33. The veto made the state's ability to retain the funds uncertain. The Court regarded the

"revival of a substantial contingent liability" sufficient to confer standing because of the potential economic affect. *Clinton*, 524 U.S. at 431. The same type of reasoning applies here. The unlicensed practice of dentistry has a potential economic effect on licensed dentists.

The Federal courts also recognize "a zone of interests" that confers standing. It cannot seriously be contested that the violation of the state Dental Practice Act through the unlicensed practice of dentistry is not within the "zone of interest" of the ADS and the individual licensed dentists. The Court in *Bennett v. Spear*, 520 U.S. 154, 162 (1997), construing the decision in *Association of Data Processing Service Organizations Inc. v. Camp*, 397 U.S. 150 (1970), found sufficient standing where the plaintiffs established that their grievance was within "the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bennett v. Spear*, 520 U.S. 154, 162 (1997). Here, the Dental Practice Act, and the Code of Ethics adopted as state law, and the requirement for all practicing dentists to be licensed by the state, establishes with clarity the zone of interest at issue and the inclusion of the Plaintiffs in that zone. Standing therefore exists.

The Court has adhered to this zone of interest standard on several occasions. In *National Credit Union Administration v. First National Bank and Trust Company*, 522 U.S. 479 (1998), the Court allowed a competing bank standing sufficient to challenge an order which was issued by the National Credit Union Administration and which had the effect of enlarging the charter of a credit union. The Court reasoned that the underlying act's purpose was to limit the scope of memberships in credit unions—an interest shared by competing banks.

Further, the zone of interest test is not intended to be strict or rigid; rather it prevents standing "only when 'the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot be assumed that Congress intended to permit the suit." *Clarke v. Securities Industry Association*, 479 U.S. 388, 399–400 (1987). The plaintiffs' interests here are fully consistent with state law—and seek an order enforcing state law.

In order to have standing to bring claims for declaratory and injunctive relief, Plaintiffs must show a significant possibility of future harm. *See e.g., Bras v California Public Utilities Commission*, 59 F.3d 869, 873 (9th Cir. 1995).

However, standing in declaratory actions should be liberally construed. *See Enos v Secretary of Environmental Affairs*, 731 N.E.2d 525 (Mass. 2000).[6]  In a declaratory action, "a party has standing when it can allege an injury within the area of concern of the statute or regulatory scheme under which the injurious action has occurred . . . if the injury alleged is within the scope of those concerns we believe that a challenger has shown sufficient injury to establish standing." *Id*. at 245.

Standing under Article III, § 2 of the United States Constitution requires that Plaintiffs establish (1) a

---

[6] Similarly, under Alaska state law, standing is very liberal in declaratory actions.  The Alaska Supreme Court has held that all that is required of a complaint seeking declaratory relief is a simple statement of the facts demonstrating that the superior court had jurisdiction and that an actual justiciable case or controversy is presented.  *See e.g., Jefferson v Asplund,* 458 P.2d 995 (Alaska 1969).  The Alaska Supreme Court has stated that "the 'basic requirement for standing in Alaska is adversity' of legal interests and that adversity can be satisfied by an 'intangible' interest such as an 'aesthetic or environmental interest.'  And we have not required that prospective plaintiffs wait until an unavoidable injury occurs before Alaskan courts may render a declaratory judgment."  *See Brause v State,* 21 P.3d 357 (Alaska 2001)(internal citations omitted).

concrete injury in fact, (2) causation between the alleged injury and the alleged conduct of the defendant, and (3) redressability.  *Lujan v Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992); *see also, See Oregon Advocacy Center v Mink*, 322 F.3d 1101, 1108 (9th Cir. 2003).

Plaintiffs are asserting individual standing for Dr. Michale Boothe, Dr. Pete Higgins, and Dr. George Shaffer (hereafter collectively referred to as "Plaintiff Dentists"). Under the first prong, Plaintiff Dentists are directly and adversely affected by the outcome of this litigation.  The unlicensed practice of dentistry deprives them of a valuable economic right -- their lawfully obtained license to practice dentistry.  In addition, it has been reported that licensed dentists have had to repair probable DHAT errors.  Such devotion to fixing and repairing dental work performed by DHATs may result in Plaintiff Dentists' other needs being sacrificed.  This diversion of resources has been recognized by various courts as a sufficient injury.  *See e.g., Mink, supra,* 322 F.3d at 1112 (holding that the association's

devoting resources to helping persons obtain timely treatment causing other needs to be unmet was a recognizable injury).

However, even if this Court finds that there is insufficient direct economic injury by the Plaintiff Dentists, Plaintiff Dentists can still prevail under the first prong by showing an imminence of the injury, though not its precise extent. *See Lujan, supra,* 504 U.S. at 564-565. Here it is inevitable that, with the continuation of unlicensed dentistry, the licensed dentists, including the Plaintiffs here, will likely encounter more patients in the future that require follow-up work directly due to the inadequate work performed by the DHATs. These DHATs have already performed a significant amount of work and are performing dental work at the present time. For instance, DHATs had performed 92 patient exams, 106 preventative services, 52 restorations, 4 pulpotomies, 4 stainless steel crowns and 85 extractions in Bethel as of March 31, 2005. Similarly in Kotzebue, DHATs have treated 340 patients, performed 144 exams, 181 preventative services, 234 restorations, and 46 extractions since March 31, 2005. It goes without saying that the continual injuries that the Defendants impose is imminent. (See Exhibit 4)

Under the second prong, Defendant is the direct cause of the injury to Plaintiff Dentists. As more fully set forth in the Complaint, it is Defendant ANTHC that helped develop and implement the Dental Health Aide Program ("DHAP") which presently employs DHATs. The ANTHC is assisting in the violation of State law. The ANTHC admits it has a direct involvement in the hiring, training and supervising of DHATS.

Under the third prong, the injury will be redressed should this Court issue an injunction. Should this Court grant the injunction, DHATs would be prohibited from engaging in the unlicensed practice of dentistry and continuing to provide inadequate and irreversible dental care to Alaskan Natives. Moreover, ANTHC would be required to hire only licensed dentists. Based on the above, Plaintiff Dentists have shown sufficient injury, causation, and redressability to allow them individual standing.

The cost of dental services by licensed dentists reflects labor costs, equipment costs, and training costs. (Boothe Affidavit). By not having to go to dental school and incur that cost, the DHATs can harm the economic rights of licensed dentists. As long as there is state regulation, all people in this field have to play by the same rules. Otherwise, a sub-

OPPOSITION TO MOTION TO DISMISS (STANDING)
*The Alaska Dental Society et al v. The Alaska Native Tribal Health Consortium, et al.,* Case No. 3:06-cv-00039-TMB
Page 20 of 36

group will be exempt from the costs of regulation and unfairly shift the risks of regulation to licensed dentists only. This is a palpable, tangible injury to licensed dentists.

### 2.    Associational Standing.

To satisfy the "case or controversy" standing requirement under Article III, § 2 of the United States Constitution, the ADS must establish that it has suffered a cognizable injury that is causally related to the alleged conduct of the defendant and is redressable by judicial action. *Lujan v Defenders of Wildlife,* 504 U.S. 555, 560-561 (1992). Absent injury to itself, an association may pursue claims as a representative of its members. *See Warth v Seldin,* 422 U.S. 490, 95 S.Ct. 2197 (1975)(holding that even in the absence of injury to itself, an association may have standing solely as the representative of its members.)

In cases where even one individual has standing in the organization, if the individuals  select its leaders, guide its activities, and finance its efforts, the association  has standing. *Hunt  v.Washington State Apple Growers Commission,* 432 U.S. 333, 344  (1977); *Doe v. Stincer,* 175 F.3d 879 (11th Cir. 1999) (federally authorized protection and advocacy organization would have standing to sue on behalf of disabled

constituents as an association, despite not having membership, if one constituent had standing). The organization need not establish that a substantial number of its members have suffered injury. Injury to a single member will do. *United Food and Commercial Workers v. Brown*, 517 U.S. 544, 555 (1996).

The Court in *Hunt* reasoned that representative standing exists where the claim for relief sought does not require the participation of an injured individual. This element is typically satisfied when the plaintiff association seeks injunctive or declaratory relief—as is the case here. *Pennell v. City of San Jose*, 485 U.S. 1, 7 (1988); *Hospital Council of Western Pennsylvania v. City of Pittsburgh*, 949 F.2d 83, 89 (3d Cir. 1991). Accordingly, because the ADS membership consists of licensed dentists, and individual licensed dentists have standing, so does the ADS.[7]

---

[7] Further, the ADS has standing in its own right, since the harm to its members will harm it relative to membership, financing and operations. Accordingly, a group that suffers or will suffer economic harm or diminution in membership attributable to unlawful conduct has an individual injury sufficient to confer standing. *See, e.g., NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 459–60 (1958); *Joint Anti-Fascist Refugee Committee v.McGrath,* 341 U.S. 123, 157–59 (1951) (concurring opinions of Frankfurter, J., Douglas, J., and Burton, J.); *M.O.C.H.A. Society v. City of Buffalo,* 199 F. Supp. 2d 40, 46(W.D.N.Y. 2002) (finding associational standing based on loss of membership); *Wyoming Timber Industry Association v. U.S. Forest Service,* 80 F. Supp. 2d 1245, 1253 (D.Wyo. 2000) (validating organizational standing based on economic harm to a trade association).

The courts have long recognized that an organization has standing to sue to redress injuries suffered by its members without a showing of injury to the association itself and without a statute explicitly permitting associational standing. In *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), the Supreme Court explicitly recognized that "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members." *Id.* at 511, 95 S.Ct. 2197. The Court stated that "[t]he association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Id.* Such allegations (and proof supporting such allegations) have been made here. "So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable ···, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction." *Id.*

In addition, the ADS is comprised entirely of licensed dentists. The court in *Johnson v. Hospital Corp. of America*,

95 F.3d 383, 390 (5th Cir. 1996), concluded that a professional association (referred to as "PA2") has standing to pursue relief if its members are harmed and those members are the "primary assets" of the professional organization:  "PA2 possesses this Article III requirement for standing. Because Rea and Johnson generate all of the revenues of PA2, they are the primary assets of that association. As a result, PA2 is injured in fact by the Hospital's summary suspensions of Rea and Johnson and we may relieve that injury by awarding damages to PA2." *Id.* Applying this reasoning here, the ADS likewise has standing.   If its membership suffers losses, it will suffer.

Also, organizations have standing to vindicate interests that directly implicate the purpose of the organization. In *Arkansas Medical Soc., Inc. v. Reynolds*, 6 F.3d 519, 528 (8th Cir. 1993), the Eighth Circuit concluded that, as an alternative basis to standing, an organization that seeks to protect the interests of the organization relevant to the organization's purposes has standing. As explained by the court: "Second, the organizations, through this lawsuit, are obviously seeking to protect interests that are directly relevant to the organizations' purposes." Here, the purpose

of the ADS includes protecting the public and its membership of licensed dentists. (Exhibit 3)

The court in *National Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 166 F.Supp.2d 1155, 1165-66 (E.D.Mich.2001), held that a professional association had standing to assert anti-trust claims particularly since the relief sought was injunctive—just as the relief sought here is injunctive:

> Defendants additionally contend that Plaintiff lacks standing to bring this action. At issue is whether a representative organization, such as a union, has standing to sue for antitrust injuries inflicted upon its members. The answer to that question largely depends upon the remedy sought.
>
> * * *
>
> In contrast, in *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the Court held that an association may have standing to assert the claims of its members where it has suffered no injury from the challenged activity.
>
> > [W]e have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in

the lawsuit. *Id.* at 343, 97 S.Ct. 2434.

The third element-that no individual member participation be required-speaks to the remedy being sought. "'[S]o long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.'" *Hunt* at 342-343, 97 S.Ct. 2434, *quoting Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

Specifically, associational standing is appropriate when declaratory or injunctive relief is being sought:

> Whether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case **the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind.**' *Hunt* at 343, 97 S.Ct. 2434, *quoting Warth* at 515, 95 S.Ct. 2197.

*National Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 166 F.Supp.2d 1155, 1165-66(E.D.Mich.2001)(emphasis added). Here, the relief sought is

OPPOSITION TO MOTION TO DISMISS (STANDING)
*The Alaska Dental Society et al v. The Alaska Native Tribal Health Consortium, et al.*, Case No. 3:06-cv-00039-TMB
Page 26 of 36

declaratory and injunctive. The remedy sought will benefit the ADS members.

Associational standing is in part granted because the Supreme Court has recognized that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Brock*, 477 U.S. 274, 290 (1986).

The ADS is an association that vindicates the interests and rights of both the public and those in their profession. (Exhibit 3)  For instance, ADS's Mission Statement is to pursue policies "that enhance the dental profession and the well being of Alaskans."  (Exhibit 3).  It is further noted that "this organization recognizes and adheres to the American Dental Association's Principles of Ethics and Code of Professional Conduct." (Exhibit 3).  This is sufficient to grant it associational standing.

Plaintiffs are adversely affected by the outcome of this litigation because of the potential economic harm to their rights as licensed dentists.  Plaintiffs represent the dentistry profession which is committed to giving the best health care to the public, which includes advocating for

Alaska Natives and against second-class care by DHATs. Plaintiffs are a vehicle for and the means by which dentists and patients can express their views and protect their collective interests. Such advocacy was recognized in *Hunt*. *See Hunt, supra,* 432 U.S. at 345.

The ADS arguably has a duty to protect the interests of the Alaskan Natives. Congress has recognized that the health needs of the American Indian people are severe and the health status is far below that of the general population of the United States. *See* PL 94-437, 1976 Sec. 522. Congress recognized that the improvement of Indian health was imperiled by insufficient services and inadequate, inefficient facilities which included **unaccredited** facilities. *See id.* In response, Congress declared the following:

> Congress hereby declares that it is the policy of this Nation, in fulfillment of its special responsibilities and legal obligations to the American Indian people, to meet the national goal of providing the highest possible health status to Indians and to provide existing Indian heals services with all resources to effect that policy.

*See id.* (Sec. 3. 25 USC 1602). Congress enacted the Indian Health Care Act to ensure that the health needs of the American Indian people were adequately fulfilled, including

their dental needs.    Providing illegal and unlicensed DHATS exacerbates the problem.

The interests Plaintiffs are seeking to protect in this suit are clearly germane to the purpose of the organization. Some of the main goals of organized dentistry are promoting the science of dentistry, ensuring quality dental care, and maintaining a quality profession.    The ADS is protecting its profession against the non-licensed, illegal and inadequate practice of dentistry.    Such protection of resources and professionalism has been found to satisfy the second prong in *Hunt*.    *See e.g.*, *The Alaska Fish and Wildlife Federation and Outdoor Council, Inc. v Dunkle*, 829 F.2d 933, 938 (9th Cir. 1986)(finding that preventing extinction of birds was germane to purpose of protecting the beneficial pursuits of hunting and scientific wildlife management practices.)    Consequently, Plaintiffs have established the second prong in *Hunt*.

The third prong requires that neither the claim asserted nor the relief requested must require the participation of individual members in the lawsuit.    *See Hunt, supra*, 432 U.S. at 343.    Members do not need to participate directly in the litigation when the members seek declaratory and prospective relief rather than money damages.    *See e.g.*, *The Alaska Fish*

OPPOSITION TO MOTION TO DISMISS (STANDING)
*The Alaska Dental Society et al v. The Alaska Native Tribal Health
Consortium, et al.*, Case No. 3:06-cv-00039-TMB
Page 29 of 36

and *Wildlife Federation and Outdoor Council, Inc. v Dunkle*, 829 F.2d 933, 938 (9th Cir. 1986); *see also, Associated Gen'l Contractors of California, Inc. v Coalition for Economic Equity, et al.*, 950 F.2d 1401, 1408 (9th Cir. 1991). Therefore the Plaintiffs have fulfilled the third prong because even though not required, the individual members are participating in this lawsuit and the Plaintiffs are seeking declaratory relief rather than money damages.    In sum, the ADS has associational standing to sue on behalf of its members.

### 3.    Third-Party Standing.

Additionally, the dentists have third-party standing to assert claims for their patients.    Plaintiffs concur that a litigant must "normally assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *See Powers v Ohio*, 499 U.S. 400, 410 (1991).    However, this rule is not absolute. The Supreme Court has indicated that this rule should not be applied where "its underlying justifications are absent." *Singleton v Wulff*, 428 U.S. 106, 123-24 (1976).

The Supreme Court has granted third-party standing when the third-party is hindered from asserting his or her own rights, but shares the same interests as the plaintiff.    *See*

*e.g, Craig v Boran,* 429 U.S. 190, 193-95 (1976); *Singleton v Wulff,* 428 U.S. 106, 123-24 (1976). The Supreme Court has also noted that in certain circumstances, third-party standing is appropriate because "the relationship between the litigant and the third party may be such that the former is fully, or very nearly as effective a proponent of the right as the latter." *See Singleton, supra,* 428 U.S. at 115. This is one such case.

It has been held that a litigant may represent the interests of a third party when 1) the litigant has suffered some injury in fact, 2) the litigant has a close relationship with the third party, and 3) some hindrance exists to the third party's ability to protect his/her own interest. *Powers v Ohio, supra* 499 U.S. at 411 (citing *Singleton, supra.*)

Under the first prong, Plaintiffs are injured by Defendants' undermining Plaintiffs' ability to provide quality health care. Plaintiffs represent the dentistry profession which is committed to giving the best health care to the public, which includes advocating for Alaskan Natives and against inadequate care by DHATs. Plaintiffs provide the means by which dentists and patients can express their views

OPPOSITION TO MOTION TO DISMISS (STANDING)
*The Alaska Dental Society et al v. The Alaska Native Tribal Health Consortium, et al.,* Case No. 3:06-cv-00039-TMB
Page 31 of 36

and protect their collective interests. Such advocacy was recognized in *Hunt*. *See Hunt, supra*, 432 U.S. at 345.

Under the second prong, the closeness in relationship has been called the zone of interest test (discussed above). The Ninth Circuit follows the Supreme Court in that the "zones of interest test is 'not meant to be particularly demanding'." *National Wildlife Federation v Burford*, 871 F2d 849, 852 (9th Cir. 1989)(citing *Clark v Securities Indus. Ass'n.*, 479 U.S. 388, 399 (1987).) "The test is used simply to determine whether the plaintiff's interests more than marginally relate to the purpose implicit in the statute at issue." *Id.* The Plaintiffs' injuries here, including inadequate and irreversible dental care to Alaskan Natives performed by DHATs, fall squarely within the zone of interest protected by the Dental Practice Act.

Plaintiffs also have a close relationship with their patients. Courts have long recognized the close relationship between physicians and patients. *See e.g., Singleton, supra.* In *Singleton*, the Supreme Court found third-party standing for physicians to sue on behalf of their patients who were prohibited from obtaining Medicaid funding for certain abortions. *See id.* at 107. Likewise in *Pennsylvania*

*Psychiatric Society v Green Springs Health Services, Inc.*, 280 F.3d 278 (3rd Cir. 2002), the Third Circuit found third-party standing for psychiatrists to challenge managed care organizations which they alleged improperly refused to authorize necessary treatment for their patients.  The Third Circuit explained that:

> Psychiatrists clearly have the kind of relationship with their patients which lends itself to advancing claims on their behalf.  This intimate relationship and the resulting mental health treatment ensures psychiatrists can effectively assert their patients' rights.  Because the Pennsylvania Psychiatric Society alleges the MCOs prevent patients from receiving necessary mental health services and psychiatrists from providing them, its member psychiatrists would be well-suited to litigate these claims for both parties, as their interests are clearly aligned.

*Id.* at 289.  Like the physicians in *Singleton* and the psychiatrists in *Pennsylvania Psychiatric Society*, the Plaintiffs also have close relationships with their patients. Dentists fall within the same category as a physician and psychiatrist in this regard.  Therefore, Plaintiffs have established prong two.

Under prong three, Plaintiffs must show that their Alaskan Native patients and other potential patients are hindered from bringing this suit themselves.  There are

significant and several hindrances to Alaskan Natives bringing this suit, including cultural and geographical barriers which make the court system inaccessible to them.    These hindrances have been recognized by our Alaska Supreme Court, wherein it stated:

> [T]he fact that many of Alaska's Native villages are located far from the courtrooms of our state trial courts limits our state judicial system's ability to respond to the needs of many Alaska Natives.    Moreover, we have recognized that Alaska is home to "uniquely divergent cultures, "including many "Native cultures which remain today much as they were prior to the infusion of Anglo-American culture."    Because of this great diversity, barriers of culture, geography, and language combine to create a judicial system that remains foreign and inaccessible to many Alaska Natives.    These differences have "created problems in administering a unified justice system sensitive to the needs of Alaska's various cultures.

*John v Baker*, 982 P.2d 738, 760 (Alaska 1999)(holding the state court had concurrent jurisdiction with the tribal court over a child custody matter in part because of the policy concerns of the barriers unique to Alaskan Natives.)

A patient's hesitance to bring suit due to privacy issues has also been held sufficient under the hindrance test.    *See Singleton*, 428 U.S. at 117-118.    In *Singleton*, the Supreme Court found that women were hindered from bringing suit in order to protect their privacy and they also faced mootness to

1  their claims.  *See id.*   Likewise here, the Alaskan Natives
2  face issues of privacy and mootness.   Like *Singleton*, the
3  publication of their health records is a hindrance to bringing
4  this suit due to privacy issues.   Moreover, the Alaska Natives
5  will suffer a chilling effect from asserting their rights
6  which has also been recognized as a hindrance.   Further
7  complicating the matter, the ANTHC (which should be advocating
8  for equal standards of care), is arguing for second-class
9  care.   Thus, what should be a likely proponent for Alaska
10  Natives isn't.   Even worse, the State refuses to enforce
11  state law.   It appears that only the Plaintiffs will seek to
12  protect Alaska Natives and uphold State law.

13    Last, a third party's lack of incentive to litigate on
14  his/her own behalf is sufficient under the hindrance test.
15  *See Powers, supra*, 499 U.S. at 415.   In addition to many
16  barriers that the Alaskan Natives face, they have little
17  incentive to bring this suit because even though the health
18  care is inadequate, it is free.   Therefore, there are several
19  and significant hindrances preventing Alaskan Natives from
20  bringing this suit on their own.

21
22
23
24
25

OPPOSITION TO MOTION TO DISMISS (STANDING)
*The Alaska Dental Society et al v. The Alaska Native Tribal Health
Consortium, et al.,* Case No. 3:06-cv-00039-TMB
Page 35 of 36
26

Based on the above, Plaintiffs have satisfied all three prongs to enable the Plaintiffs to assert third-party standing on behalf of the Alaska Native dental patients.

### IV.  CONCLUSION

For all the foregoing reasons, this Court should deny Defendant's motion to dismiss based on a finding of individual, third-party, associational, and statutory standing.


DATED at Anchorage, Alaska, this 28th day of April, 2006.

                                   s/  Thomas V. Van Flein
                                   CLAPP, PETERSON, VAN FLEIN
                                   TIEMESSEN & THORSNESS, LLC
                                   Attorneys for Plaintiffs
                                   711 H Street, Suite 620
                                   Anchorage, Alaska 99501-3454
                                   Tel:  (907)  272-9272
                                   Fax:  (907)  272-9586
                                   (907) 272-9272
                                   usdc-anch-ntc@cplawak.com
                                   Attorneys for Plaintiffs


### Certificate of Service

I hereby certify that on April 28th, a copy of the foregoing document was served electronically on Richard D. Monkman, Myra M. Munson, Douglas Serdahely, and Aaron M. Schutt.

s/ Barbara M. Pauli


OPPOSITION TO MOTION TO DISMISS (STANDING)
*The Alaska Dental Society et al v. The Alaska Native Tribal Health Consortium, et al.,* Case No. 3:06-cv-00039-TMB
Page 36 of 36